IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | |
|---|---|
| University of North Dakota, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM OPINION AND** |
| vs. ) | **ORDER ON JAMES HARDIE** |
| ) | **PARTIES' MOTION FOR PARTIAL** |
| James Hardie Research Pty, Ltd., an ) | **SUMMARY JUDGMENT** |
| Australian Corporation, James Hardie ) | |
| Building Products, Inc., a Nevada ) | |
| Corporation, James Hardie Int'l Finance ) | Civil File No. 2:04-cv-152 |
| B.V., a Netherlands Corporation, certain ) | |
| Furnace Equipment, certain Furnace ) | |
| Equipment Designs, certain Furnace ) | |
| Specifications, and Does 1-10, ) | |
| ) | |
| Defendants. ) | |
| ―――――――――――――――――― ) | |
| ) | |
| James Hardie Building Products, Inc. and ) | |
| James Hardie Int'l Finance B.V., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Civil File No. 2:05-cv-44 |
| ) | |
| Energy & Environmental Research ) | |
| Center, and Does 1 through 50, inclusive, ) | |
| ) | |
| Defendants. ) | |

Before the Court is a motion by the James Hardie parties for partial summary judgment.

EERC/UND filed a brief in opposition. On April 27, 2006, the Court held a hearing on the matter.

**SUMMARY OF DECISION**

Based on the plain meaning of the contract between the parties, the James Hardie parties own

1

all the intellectual property developed under the project as long as that intellectual property is connected to a process for creating cenospheres if the resulting cenospheres can be used in products and systems used or consumed in the building and construction industry.  This plain meaning interpretation is supported by the structure of the contract and other provisions within the contract.  No rational argument for an alternative interpretation has been offered, so the Court may not consider extrinsic evidence to interpret the contract in a manner that conflicts with the text.

The James Hardie parties did identify in writing other uses for the new intellectual property, and they licensed these other uses to another company.  The James Hardie parties identified and licensed these uses before EERC identified any uses, therefore the James Hardie parties own the rights to those uses.

EERC has identified a type of cenosphere that it alleges cannot be used in the building and construction industry.  Therefore, a genuine question of material fact exists as to whether the project developed intellectual property that cannot be used in the building and construction industry.

## FACTS

In 2001, the Energy & Environmental Research Center (EERC) and James Hardie Research Party Limited (JHRP) and James Hardie Building Products Incorporated (JHBP) signed a contract (Agreement) relating to research on the production of ash cenospheres.  Ash cenospheres produced during coal combustion "have unique properties that can be utilized in the building products industry to produce superior lightweight materials." (EERC Proposal No. 2001-0082 at 1.)[1]  EERC proposed working with the James Hardie entities to "better understand the chemical and physical properties

---

[1] Proposal No. 2001-0082 was incorporated into the Agreement in Appendix A.

2

of cenospheres, coal properties and combustion conditions that influence cenosphere formation, and the chemical and physical mechanisms of cenosphere formation." (Id.)

Under the Agreement, JHRP and JHBP paid EERC to conduct a project relating to the properties and mechanisms for the formation of ash cenospheres from coal combustion, and JHRP and JHBP would receive the results of that project. (Agreement at 25.) Other relevant provisions of the Agreement include:

> [5.4] All IP, patentable or not, developed under this Project, hereinafter referrred [sic] to as "New IP", that relates to the commercial production of Cenospheres, for use in products and systems used or consumed in the building and construction industry ("Sponsor's Domain") produced either in a power station or in any other coal-burning plant, or in any other production facility specifically for this purpose will be the sole and exclusive property of Sponsor with full rights to exploit, license, sublicense and assign and otherwise deal with within the Sponsor's Domain.
>
> [5.5] Any IP owned or at the disposal of the Contractor (either pre-existing or developed after the date of this Agreement) required by the Sponsor to exploit the New IP ("Background IP") will be available to the Sponsor and all its licensees, sub licensees, assignees and other third parties with rights to the New IP in the Sponsor's Domain on a perpetual royalty free worldwide license and the Contractor will take all steps and sign all documents that may be desirable or necessary for the Sponsor to secure title to the New IP and license [sic] and sub licenses [sic] rights to the Background IP in the Sponsor's Domain. Because of the considerable background knowledge that Contractor is bringing to this Project, due consideration will be given to the cumulative contributions made by both parties in developing IP, and good-faith negotiations will be conducted in determining revenue distribution from such IP and in this regard, under no circumstances will the Contractor be entitled to an amount in excess of USD1.00 per ton of Cenospheres produced by or for the Sponsor and used by the Sponsor.
>
> [5.6] For all other uses of New IP identified in the preceding paragraph that are identified by Contractor which are exclusive of Sponsor's Domain and are uses that Sponsor has not previously identified and commercialized or licensed, Contractor shall have a perpetual, royalty-free, exclusive worldwide license with the right to sublicense. The contractor will make it a condition of any license or sub license of New IP - exclusive of the Sponsor's Domain - that Cenospheres produced will not be sold directly or indirectly into the Sponsor's Domain (namely, products and

3

>systems used and consumed in the building and construction industry). However, if Contractor identifies such uses, in the event that Sponsor will have further developed know-how and IP in commercializing the large-scale production of Cenospheres, due consideration will be given to the cumulative contributions made by both parties in developing IP, and good-faith negotiations will be conducted to determine revenue distribution from such IP; under no circumstances will the Sponsor be entitled to an amount in excess of USD1.00 per ton of Cenospheres produced.
>
>[5.7] Any other IP, patentable or not, that is developed under this Project, but does not specifically relate to the commercial production of Cenospheres for use in products or systems used or consumed in the building and construction industry either in a power station, or in any other coal-burning plant, or in any other production facility for this purpose, will be the sole and exclusive property of Contractor.

In these contract provisions, the term "Contractor" refers to EERC and the term "Sponsor" refers collectively to JHRP and JHBP. (Agreement at 25.)

In February 2004, James Hardie International Finance, B.V. (JHIF), as the assignee of all the intellectual property rights of JHRP and JHBP, wrote to EERC and provided a list of uses for cenospheres. (John B. Sganga 11-14-05 Decl., Ex. H.) This list included a description of the use of cenospheres in containers to hold drugs and use in ion exchange applications. (Id.) In December 2004, JHBP wrote to EERC and provided another list of uses for cenospheres. (Sganga 11-14-05 Decl., Ex. J.) This list included use in plastic components for sports gear and in positioning devices for magnetic media readers. (Id.) In a contract with an effective date of March 3, 2004, JHIF granted CGC Products, LLC (CGC) a license to research and develop the market for cenospheres outside the building and construction industry and to then sell the cenospheres to those new markets. (Sganga 11-14-05 Decl., Ex. I.)

4

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court may award summary judgment to a party if there exists no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. DICO, Inc. v. Amoco Oil Co., 340 F.3d 525, 529 (8th Cir. 2003). A court views the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party. Medtronic, Inc. v. U.S. Xpress, Inc., 341 F.3d 798, 800 (8th Cir. 2003). The moving party bears the burden of demonstrating that there are no genuine issues of material fact. Id. If the moving party meets this burden, then the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Id.

The construction of a written contract is a question of law. Garofalo v. Saint Joseph's Hosp., 615 N.W.2d 160, 162 (N.D. 2000). "[A]n unambiguous contract is particularly amenable to summary judgment." Id.

Whenever possible, a court should interpret a written contract based on the writing alone. Ag Acceptance Corp. v Glinz, 684 N.W.2d 632, 637 (N.D. 2004). The goal is to ascertain the intent of the parties. Id. The parties' intent must be ascertained from the entire contract, and every clause, sentence, and provision should be given effect consistent with the main purpose of the contract. U.S. Bank v. Koenig, 650 N.W.2d 820, 823 (N.D. 2002). The words used in the contract are to be interpreted according to their plain meaning unless the parties used them in a technical sense or the parties gave a word a special meaning. N.D. Cent. Code § 9-07-09.

### I.     Commercial Production of Cenospheres

At paragraph 5.4 of the Agreement, it states that JHRP and JHBP are the sole and exclusive owners of the intellectual property that "relates to the commercial production of Cenospheres, for use in products and systems used or consumed in the building and construction industry . . . ." The plain meaning of "production" is "the act of producing; creation; manufacture." Random House Webster's Unabridged Dictionary 1544 (2d ed. 1997) [hereinafter "Webster's Dictionary"]. Therefore, the plain meaning of the first part of this clause is that the intellectual property must relate to how a certain type of cenospheres is created. The remainder of that clause, as explained next, defines the type of cenospheres that this intellectual property creates.

Following the word "cenospheres" is a comma[2] and then the phrase "for use in products and systems." "Use," in this context, means "to employ for some purpose." Webster's Dictionary 2097. The plain meaning of this clause is that the cenospheres are then employed in products and systems for some purpose. The phrase "for use in products and systems" does not modify the commercial process portion of this paragraph, since common sense dictates that a process for creating cenospheres cannot be employed in a product. This plain language interpretation also conforms to the statement in the contract that cenospheres are used to make "superior lightweight products." (EERC Proposal No. 2001-0082 at 1.)

---

[2] EERC asserts that the Court found this comma significant in its May 2, 2005 Preliminary Injunction Order. A review of that opinion reveals that the Court did not rely in any way on the comma when it interpreted Paragraph 5.4. It is merely a fact that a comma appears after the word "Cenospheres." Based on the plain language and common sense, the phrase "for use in products and systems" modifies the word "cenospheres" as explained in the text of this opinion. This would be the common sense interpretation with or without the comma. In fact, EERC agrees that the "for use" phrase modifies the word Cenospheres. (See UND's Opp. to Mot. Partial Summ. J. at 12 ("the statement ', for use in...' refers to what immediately precedes it."))

Finally, the last part of this phrase states "used or consumed in the building and construction industry." Based on its location after the phrase "products and systems," it modifies that phrase. The plain meaning of this entire clause is that the intellectual property is the process by which one creates cenospheres that can then be employed in products and systems, and those products and systems are then used or consumed in the building and construction industry. Nowhere in that phrase is there limiting language stating that the only purpose of the cenospheres has to be in products for use in the building and construction industry. As long as the commercial process creates cenospheres that can be used in products and systems used or consumed in the building and construction industry, then that process is the sole property of the James Hardie entities. The resulting cenospheres may be used in other products or systems, but as long as one of those uses is in the building and construction industry, JHRP and JHBP are the owners of that intellectual property.

Other provisions of this contract provide support for this plain language interpretation. In the paragraph following the identification of the parties, it states that EERC "is willing to" perform research on the properties and mechanisms of formation of ash cenospheres from coal combustion. (Agreement at 25.) Following this phrase, it states that the "Sponsor desires to receive the results" of this research. (Id.) At the very start of the contract there is the stated intention of the parties that JHRP and JHBP will be receiving the intellectual property from this project.

This intention is again reflected by the use of the word "all" to modify "intellectual property" at the beginning of paragraph 5.4 of the Agreement, which deals with ownership of intellectual property by the James Hardie entities. The use of the broad word "all" indicates that the parties

7

intended that the James Hardie entities would own a substantial portion of the intellectual property developed under the project.

The placement of paragraph 5.4 also supports the plain language interpretation. Paragraph 5.4 appears before any other paragraphs granting ownership in intellectual property. EERC's intellectual property rights do not appear until paragraph 5.7, and paragraph 5.7 starts with the limiting language of "[a]ny other IP." This signals that the majority of the intellectual property has been granted to someone else, and if there is "any other" intellectual property, then it belongs to EERC.

Paragraph 5.5 of the Agreement also indicates the James Hardie entities' paramount rights in this intellectual property. This clause requires EERC to make available to JHRP and JHBP on a "perpetual royalty free worldwide license" basis any intellectual property owned by EERC that is required to utilize the new intellectual property owned by the James Hardie entities. The focus of this contract is on James Hardie's intellectual property rights and ensuring that it can utilize the results of this project.

EERC argues that the Agreement is ambiguous concerning the division of the intellectual property rights. "A contract is ambiguous if rational arguments can be made for different interpretations." Trinity Health v. N. Cent. Emergency Servs., 662 N.W.2d 280, 286 (N.D. 2003). EERC argues that the interplay between paragraphs 5.4 and 5.7 of the Agreement creates the ambiguity. (UND's Opp. to Mot. for Partial Summ. J. at 7.)

As previously stated, paragraph 5.4 grants ownership to the James Hardies entities the method for producing cenospheres that can be used in products and systems that are used in the

building and construction industry. Paragraph 5.7 grants EERC ownership of any intellectual property developed under the project as long as that intellectual property does not specifically relate to a process for creating cenospheres that can be used in products and systems in the building and construction industry. Since EERC was studying coal combustion, this research project could have resulted in the discovery of a method for burning coal with less pollution. One rational interpretation of paragraph 5.7 is that EERC would then own that intellectual property since it does not specifically relate to the process for creating cenospheres "for use in products or systems used or consumed in the building and construction industry . . . ."

There are also differences in the kinds of cenospheres that can be produced. For example, there are cenospheres that are high in alkali material and cenospheres with thin walls. (Jason Laumb Depo. at 37-38.) If this project had developed a process that only created cenospheres with thin walls, then EERC would own that intellectual property as well since those cenospheres cannot be used in the building and construction industry. (Id. at 38.)

EERC has offered no rational argument for a different interpretation of this clause. It is difficult to imagine how one could interpret paragraphs 5.4 and 5.7 any other way. Since the process that creates cenospheres that can be employed in the building and construction industry is the same whether those cenospheres are actually used in products for the building and construction industry or products completely unrelated to the building and construction industry, it is impossible to split that particular item of intellectual property. Only one party can own this single method, and any arguments to the contrary would not be rational.

EERC next argues that there are certain preconditions James Hardie must satisfy before it

9

can own this process. EERC argues that James Hardie must first actually effect commercial production of these cenospheres and then use those cenospheres in the building and construction industry. EERC argues that the phrase "relates to the commercial production of Cenospheres, for use . . . ." in paragraph 5.4 supports these assertions.

The plain meaning of "relates" is "to bring into or establish association, connection, or relation." Webster's Dictionary 1626. "Commercial" means "of, pertaining to, or characteristic of commerce." Id. at 411. "Commerce" means "an interchange of goods or commodities on a large scale between different countries or between different parts of the same country." Id. Therefore, the phrase "relates to the commercial production of Cenospheres" means that this intellectual property must have a connection to a large scale method of producing cenospheres. As previously explained, the "for use" phrase that follows describes the type of cenospheres that this large scale process must be able to create. As long as the intellectual property developed under the project is connected to the large scale production of a type of cenosphere that can be used in products used in the building and construction industry, then the James Hardie entities own it. Contrary to EERC's argument, this phrase contains no requirement that James Hardie must currently be producing these cenospheres on a commercial scale. There is no language in paragraph 5.4 that would support this limitation.

EERC has failed to articulate a rational argument that is different from the plain language interpretation of these paragraphs of the Agreement. Therefore, these provisions are not ambiguous. See Trinity Health, 662 N.W.2d at 286 (stating that ambiguity exists if rational arguments can be made for different interpretations). EERC cites frequently to extrinsic evidence to support its

10

interpretation of the Agreement, but the Court may not consider this evidence because the contract is not ambiguous. Ag Acceptance, 684 N.W.2d at 637.[3] Under the Agreement, JHBP and JHRP own all intellectual property developed under the project that is connected to the large scale production of cenospheres as long as those cenospheres can be used in products and systems used or consumed in the building and construction industry.

## II.     Other Uses

James Hardie next argues that it has the exclusive rights to all of the other uses of the intellectual property that it identified in writing in February and December 2004. Paragraph 5.6 of the Agreement states, in pertinent part:

> For all other uses of New IP identified in the preceding paragraph that are identified by Contractor which are exclusive of Sponsor's Domain and are uses that Sponsor has not previously identified and commercialized or licensed, Contractor shall have a perpetual, royalty-free, exclusive worldwide license with the right to sublicense.

As previously explained, the "New IP" is the process for creating cenospheres that can be used in building and construction industry products. Under paragraph 5.6, EERC is granted a license to use that process, but that license is limited and it only exists under certain conditions.

First, EERC may only use this process in areas that are "exclusive of Sponsor's Domain." The following clause, which appears later in the same paragraph, further emphasizes this point: "Cenospheres produced will not be sold directly or indirectly into the Sponsor's Domain (namely, products and systems used and consumed in the building and construction industry)." These two clauses prohibit EERC from using its license to the cenosphere manufacturing technology to sell

---

[3] Following the hearing on this motion, EERC filed a motion to expand the record to include additional "newly discovered" evidence. The Court grants this motion to expand the record, but it did not rely on this evidence in reaching its decision because the contract is not ambiguous.

11

cenospheres to the building and construction industry.

The next relevant phrase states that the uses of this intellectual property must be "identified by Contractor" before EERC gains this license.  Under Article 11 of the Agreement, any communications required under the contract must be in writing, and the communication is deemed given when it is received at the addresses listed in Article 11.  Therefore, any uses for this intellectual property had to be identified in writing by EERC and sent to JHRP or JHBP's address.

The final restriction on EERC's license states that these uses must be ones "that Sponsor has not previously identified and commercialized or licensed . . . ."  In February and December 2004, the James Hardie entities informed EERC in writing of certain uses for the cenospheres that could be produced by the techology developed under the project.  (Sganga 11-14-05 Decl., Exs. H & J.)  In March 2004, the James Hardie entities gave CGC a license to use this intellectual property outside the building and construction industry.  (Sganga 11-14-05 Decl., Ex. I.)  Since the James Hardie entities have identified and licensed certain uses, EERC's license is limited to those uses that have not been previously identified and licensed or commercialized.

EERC argues that it has identified uses for the intellectual property outside the building and construction industry.  (UND's Opp. to Mot. Partial Summ. J. at 17.)  In a letter dated April 4, 2005, EERC notified JHBP of uses for this intellectual property.  (Sganga 11-14-05 Decl., Ex. L.)  However, this written notification came months after the James Hardie entities gave EERC written notice of uses for the intellectual property outside the building and construction industry.  In addition, EERC has failed to identify uses in its April 2005 notice that are different from the James Hardie notices.  See Medtronic, Inc., 341 F.3d at 800 (stating that the nonmoving party must direct

12

the court to the existence of specific facts in evidence to defeat summary judgment). In fact, a cursory review of the parties' notices demonstrates that some, if not all, of the uses identified by EERC were previously identified by the James Hardie entities. (<u>Compare</u> Sganga 11-14-05 Decl., Exs. H & J <u>with</u> Ex. L.) Therefore, under the plain meaning of paragraph 5.6 of the Agreement, EERC would not have a license to the new technology for uses that James Hardie identified first.

EERC next argues that the phrase "identified in the preceding paragraph" creates an ambiguity in paragraph 5.6. Paragraph 5.5 requires EERC to give James Hardie a license to any intellectual property EERC owns that is necessary for James Hardie to exploit the new intellectual property developed under the project.

EERC's interpretation of the phrase "identified in the preceding paragraph" is that it modifies the word "uses." Therefore, EERC argues that since paragraph 5.5 discusses a license for EERC's intellectual property, then paragraph 5.6 only relates to uses of the new intellectual property that require EERC's intellectual property.

James Hardie's interpretation is that the phrase "identified in the preceding paragraph" modifies the term "New IP." The term "New IP" does appear in paragraph 5.5.

The flaw in EERC's interpretation is that there are no "uses" for the new intellectual property that are identified in paragraph 5.5. Paragraph 5.5 merely grants James Hardie a license to some of EERC's intellectual property and provides for payment. Since paragraph 5.5 does not mention any uses for the new intellectual property, it is not rational to interpret the phrase "identified in the preceding paragraph" as modifying the word "uses."

The alternate interpretation of this phrase is rational since the term "New IP" appears three

13

times in paragraph 5.5.  Therefore, the phrase "New IP identified in the preceding paragraph" would refer to the term "New IP" in paragraph 5.5.  The term "New IP" is specifically defined in paragraph 5.4 as "[a]ll IP, patentable or not, developed under this Project . . . ."  The term "IP" is defined in paragraph 5.1.  Therefore, the phrase has the same meaning as it does throughout the Agreement.  The "New IP" would be the intellectual property that was developed under the project.  Since EERC has not offered a rational argument for a different interpretation, this phrase is not ambiguous.

Finally, EERC argues that James Hardie has not licensed the uses for the new intellectual property that it identified.  EERC alleges that CGC is a mere alter ego of JHBP, so the license to CGC is invalid because CGC does not have a separate, valid existence.

Under certain circumstances, a court may disregard the corporate form.  Jablonsky v. Klemm, 377 N.W.2d 560, 564 (N.D. 1985).  The following factors are considered significant when deciding whether to disregard the corporate form:

> insufficient capitalization for the purposes of the corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and the existence of the corporation as merely a facade for individual dealings.

Hilzendager v. Skwarok, 335 N.W.2d 768, 774 (N.D. 1983).  A corporate entity's status as a wholly owned subsidiary of another corporation is insufficient to disregard the subsidiary's corporate form. Indus. Comm'n v. Wilber, 453 N.W.2d 824, 825 (N.D. 1990).

EERC alleges that the following facts create a genuine issue of material fact regarding CGC's status: no employees actually work at CGC's official address, CGC is wholly owned by JHBP, and all of CGC's employees are paid by James Hardie.  The fact that CGC is a wholly owned

subsidiary of JHBP is insufficient to disregard the corporate form.  Wilber, 453 N.W.2d at 825. Whether employees actually work at the official mailing address for a company has no relevance to a decision to disregard the corporate form.  A parent corporation's payment of the salaries of employees of the subsidiary is also not one of the factors a court looks at when determining whether to disregard the corporate form.  See Hilzendager, 335 N.W.2d at 774 (listing the factors). Therefore, EERC has not raised a genuine issue of material fact regarding whether CGC's limited liability company status should be disregarded.  James Hardie has satisfied the "identify and license" conditions of paragraph 5.6 of the Agreement.

### III. Other Intellectual Property

Finally, James Hardie seeks a determination that the parties never developed any intellectual property that would fall under the description of "any other IP" referred to in paragraph 5.7 of the Agreement.  As previously discussed, under paragraph 5.7, EERC owns any other intellectual property developed under the project as long as it does not specifically relate to the creation of cenospheres that can be used in the building and construction industry.

EERC alleges that cenospheres that are high in alkali material cannot be used in a concrete-based building product. (Laumb Depo. at 37.)  EERC further alleges that under the project with JH it developed intellectual property to create cenospheres that were high in alkali material. (Id. at 38.) If the project did develop a process for only creating cenospheres with a high alkali content, and those cenospheres cannot be used in the building and construction industry, then EERC would own that intellectual property.  Therefore, EERC has raised a genuine issue of material fact regarding whether the project developed intellectual property covered by paragraph 5.7 of the Agreement.

## **DECISION**

Based on the foregoing, the Court has determined the following:

1. JHBP and JHRP own all the intellectual property developed under the project that is connected to a process for creating cenospheres if the resulting cenospheres can be used in products and systems used or consumed in the building and construction industry.

2. The James Hardie entities own the rights to those uses of the new intellectual property that it identified in February and December 2004.

3. There is a genuine issue of material fact as to whether the project developed intellectual property that relates to creating cenospheres that cannot be used in the building and construction industry.

**IT IS SO ORDERED**.

Dated this 27th day of June, 2006.

*[signature]*

Ralph R. Erickson, District Judge
United States District Court